UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

COVENANT MEDICAL
CENTER, INC.,

                Plaintiff,                              Case No. 12-12901

                                                        Honorable Thomas L. Ludington

v.

KATHLEEN SEBELIUS, SECRETARY
OF HEALTH AND HUMAN
SERVICES,

                Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This case presents a narrow question related to the Patient Protection and Affordable

Care Act (ACA): Does § 5504(c) of the Act mandate the reopening of a hospital cost report

concerning a period before the ACA's enactment because there was an appeal pending

concerning that cost report when the ACA was enacted? Because the ACA does not mandate the

reopening of such a cost report, Covenant Medical Center, Inc.'s motion for summary judgment

will be denied, the Secretary of Health and Human Services's motion for summary judgment will

be granted, and judgment will be entered in the Secretary's favor.

**I**

**A**

Established in 1965 under Title XVIII of the Social Security Act, Medicare is a federally

funded health insurance program for the elderly and disabled. Subject to a few exceptions,

"Congress authorized the Secretary of Health and Human Services (Secretary) to issue

regulations defining reimbursable costs and otherwise giving content to the broad outlines of the

Medicare statute." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506–07 (1994). The Secretary's authority "encompasses the discretion to determine both the 'reasonable cost' of services and the 'items to be included' in the category of reimbursable services." *Id*. at 507.

The legislative history accompanying the Act demonstrated Congress's goal that hospitals would be reimbursed, at least in part, for the various expenses related to training doctors, nurses, residents, and medical students:

> Many hospitals engage in substantial education activities, including the training of medical students, internship and residency programs, the training of nurses, and the training of various paramedical personnel. Educational activities enhance the quality of care in an institution, and it is intended that until the community undertakes to bear such education costs in some other way, that a part of the net cost of such activities (including stipends of trainees as well as compensation of teachers and other costs) should be considered an element in the cost of patient care, to be borne to an appropriate extent by the hospital insurance program.

S. Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S. Code Cong. & Admin. News 1943, 1977. This was, in effect, a method of countering the long apprenticeships and high indebtedness of the medical profession, and ensuring adequate training across different programs. *See* Eugene C. Rich et al., *Medicare Financing of Graduate Medical Education: Intractable Problems, Elusive Solutions*, J. Gen. Intern. Med. 283 (2002).

Pursuant to this goal, under the Medicare Act, 42 U.S.C. § 1395 *et seq*., the Secretary reimburses inpatient hospitals for certain costs associated with "graduate medical education" (GME). *Id*. § 1395ww(h); *see also id*. § 1395ww(d)(5)(B). Medicare payments also include an adjustment for the indirect costs associated with GME. *Id*. The Secretary pays hospitals for these expenses based on the number of "full time equivalent" (FTE) residents in the hospital's residency program. *Id*. § 1395ww(h)(2). Before the enactment of the ACA, the Secretary reimbursed a hospital for the time its residents spent in patient care activities "under an approved medical residency training program" only if "the hospital incurred all, or substantially all, of the

- 2 -

costs for the training program." *Covenant Med. Ctr., Inv. v. Sebelius*, 424 F. App'x 434, 435 (6th Cir. 2011) (brackets omitted).

But the ACA, enacted in 2010, changed all that. Section 5504 of the ACA amended § 1395ww(h) "for cost reporting periods beginning on or after July 1, 2010," so that a hospital can now be reimbursed for the time spent by its residents in training programs even if the hospital did not incur substantially all of the costs for the program. Instead, the time spent training by a hospital's residents counts toward the hospital's FTE score, and is thus reimbursable, so long as the hospital incurs specific costs:

> Effective for cost reporting periods beginning on or after July 1, 2010, all the time so spent by a resident shall be counted towards the determination of [FTE] . . . if a hospital incurs the costs of the stipends and fringe benefits of the resident during the time the resident spends in that setting. If more than one hospital incurs these costs, either directly or through a third party, such hospitals shall count a proportional share of the time, as determined by written agreement between the hospitals, that a resident spends training in that setting.

Section 1395ww(h)(4)(E)(ii). Notably, § 5504 of the ACA established that its amendments to the Medicare statute "shall not be applied in a manner that requires the reopening of any settled hospital cost reports as to which there is not a jurisdictionally proper appeal pending as of the date of the enactment of this Act on the issue of payment or indirect costs of medical education . . . ." ACA, Pub. L. 111-148, § 5504(c), 124 Stat. 119, 660 (2010) (§ 5504(c)).

Thus, it is clear that the Secretary will not reimburse hospitals under the new proportional ACA criteria for any cost reports related to a period commencing before July 1, 2010, unless the hospital had an appeal pending when the ACA was enacted. But, of course, it is not apparent from the face of the statute whether hospitals that *did* have an appeal pending at the time of enactment are entitled to reimbursement utilizing this new proportional criteria.

- 3 -

In November 2010, the Secretary explicitly rejected the notion that § 5504(c) mandates the reopening of cost reports for periods before July 2010 simply because there was a pending appeal when the ACA was enacted:

> There appears to be a misreading of our interpretation of section 5504(c). The effective date of the provisions of section 5504 is clearly July 1, 2010. This date is unambiguously stated in the plain text of section 5504(a), which states that it is "effective for cost reporting periods beginning on or after July 1, 2010." Similarly, section 5504(b) is "effective for discharges occurring on or after July 1, 2010." Our discussion of section 5504(c) in the August 3, 2010 proposed rule (75 FR 46385) only intended to explain our interpretation of the phrase "a jurisdictionally proper appeal pending" in the context of the plain language of the statute. However, we are clarifying in this final rule that, as noted above, and unlike some other provisions of the Affordable Care Act, section 5504 is fully prospective, with an explicit effective date of July 1, 2010, for the new standards it creates. Nothing in section 5504(c) overrides that effective date. Section 5504(c) merely notes that the usual discretionary authority of Medicare contractors to reopen cost reports is not changed by the provisions of section 5504; it simply makes clear that Medicare contractors are not required by reason of section 5504 to reopen any settled cost report as to which a provider does not have a jurisdictionally proper appeal pending. *It does not require reopening in any circumstance; and the new substantive standard is, in any event, explicitly prospective.* We believe if Congress had wanted to require such action or to apply the new standards to cost years or discharges prior to July 1, 2010, it would have done so in far more explicit terms.

75 Fed. Reg. 71,800, 72,136 (Nov. 24, 2010) (emphasis added).

## B

In addition to the text of the Medicare Act itself, federal regulations also govern cost reimbursement to hospitals. Those regulations require, among other things, a written agreement between providers and nonhospital physician training sites in order to include residents' time toward Covenant's FTE score.

Tasked with "establish[ing] rules . . . for the computation of the number of full-time-equivalent residents," § 1395ww(h)(4)(A), the Secretary determined that "the time residents spend in nonprovider settings such as freestanding clinics, nursing homes, and physicians' offices in connection with approved programs may be included in determining the number of

FTE residents in the calculation of a hospital's resident count" so long as certain conditions are satisfied. 42 U.S.C. §§ 413.78(d); 413.78(e); 413.78(f); 413.78(g). One such condition, imposed by the Secretary, is the written-agreement requirement.

For cost reporting periods between January 1, 1999, and October 1, 2004, the written-agreement requirement could only be satisfied with an agreement "indicat[ing] that the hospital will incur the cost of the resident's salary and fringe benefits while the resident is training in the nonhospital site and the hospital is providing reasonable compensation to the nonhospital site for supervisory teaching activities." *Id*. § 413.78(d)(2).

For periods commencing between October 1, 2004, and July 1, 2007, a hospital could satisfy the requirement in one of three ways: (1) by paying "all or substantially all of the costs of the training program in a nonhospital setting"; (2) by having in place "a written agreement between the hospital and the nonhospital site that states that the hospital will incur the cost of the resident's salary and fringe benefits while the resident is training in the nonhospital site"; or (3) by having in place "an emergency Medicare GME affiliation agreement in accordance with § 413.79(f)(6)[.]" *Id*. § 413.78(e)(3).

Similarly, for cost periods beginning between July 1, 2007, and July 1, 2010, the requirement could be satisfied in one of three ways: (1) by paying "all or substantially all of the costs for the training program in a nonhospital setting"; (2) by having in place "a written agreement . . . between the hospital and the nonhospital site before the training begins that states that the hospital will incur at least 90 percent of the total of the costs of the resident's salary and fringe benefits (and travel and lodging where applicable) while the resident is training"; or (3) by having in place "an emergency Medicare GME affiliation agreement in accordance with § 413.79(f)(6)[.]" *Id*. § 413.78(f)(3).

Finally, for cost periods beginning on or after July 1, 2010, a hospital can satisfy the written-agreement requirement by either "incur[ring] the costs of the salaries and fringe benefits of the resident during the time the resident spends in the nonprovider setting," or by having in place "a written agreement between the hospital or hospitals and the outside entity that states that the residents' salaries and fringe benefits (including travel and lodging where applicable) during the time the resident spends in the nonprovider setting is to be paid by the hospital(s)." *Id*. § 413.78(g)(3). Just like § 5504(c), § 413.78(g)(6) of the regulations establishes that the new amendments "cannot be applied in a manner that would require the reopening of settled cost reports, except those cost reports on which there is a jurisdictionally proper appeal pending on direct GME or IME payments as of March 23, 2010." *Id*. § 413.78(g)(6).

## C

In order to obtain reimbursement under Medicare's framework, a hospital must submit a cost report to a Medicare administrative contractor (MAC), which was previously called a "fiscal intermediary." *See* 42 U.S.C. §§ 1395h(a), 1395kk-1(a)(4). The MAC reviews the hospital's cost report and then issues a final determination, also known as a "notice of program reimbursement" (NPR), establishing the total amount the hospital should be reimbursed for the services it rendered to Medicare beneficiaries during the reporting period.

If the hospital "is dissatisfied with [the] final determination . . . as to the amount of total program reimbursement due," that hospital may appeal the MAC's NPR to the Provider Reimbursement Review Board (PRRB) if it meets various jurisdictional requirements. *See* 42 U.S.C. § 1395oo(a). The PRRB has authority to decide certain issues, but not those that question the Secretary's interpretation of the Medicare statute. *Id*. § 1395oo(f)(1); *see also* 42 C.F.R. § 405.1842(f)(1)(ii). In circumstances where the PRRB determines that it cannot address the legal

challenge brought by a provider, it may grant "expedited judicial review," which allows a provider to dispense with further administrative proceedings. Such a decision by the PRRB is "a final decision and not subject to review by the Secretary," § 1395oo(f)(1), but may instead be appealed directly to federal court.

### D

Covenant runs an inpatient hospital in Saginaw, Michigan. In 1968, Covenant and another Saginaw hospital, St. Mary's, launched a joint venture now known as the Synergy Medical Education Alliance. Synergy operates a residency program in which residents provide patient care at the Synergy Clinic as well as at Covenant and St. Mary's. Covenant and St. Mary's divide Synergy's operating costs each year based on the overall percentage of time that Synergy residents spend at each hospital. *See Covenant Med. Ctr., Inc. v. Sebelius*, 424 F. App'x 434, 435 (6th Cir. 2011).

As a result, Covenant has partially funded Synergy's operations for many years. In a previous case (*Covenant I*), Covenant challenged the Secretary's refusal to reimburse it for GME and other associated costs incurred during Synergy's operations for the years 1999–2001. *See Covenant*, 424 F. App'x 434. The case turned on the applicability of the written-agreement requirement in connection with claims for medical-education costs. The Sixth Circuit established that the written-agreement requirement "legitimately applied to Covenant," and that the Secretary "permissibly concluded that Covenant did not meet [that requirement]." *Id*. at 439. As a result, Covenant's request for reimbursement for 1999–2001 was denied.

In the current case, Covenant seeks reimbursement for GME and other associated costs for the fiscal years 2002, 2003, 2004, 2005, and 2006. Its cost reports for those years include more than $3.6 million in expenses related to GME payments and other adjustments arising from

Synergy residents' work.  After the MAC audited Covenant's cost reports, however, it issued an NPR disallowing reimbursement for those costs.  Subsequently, Covenant requested a hearing before the PRRB for each of the five cost reports.

The PRRB concluded that it was bound by the ACA, the relevant federal regulations, and the Sixth Circuit's decision in *Covenant I*.  Admin. R. 6.  It noted that "[t]he parties have entered into a stipulation in which they agree that the current cases are identical to the facts in [*Covenant I*]," and since there was no written agreement in *Covenant I*, the PRRB was forced to "conclude that there is no written agreement between the Provider and Synergy" related to the 2002–2006 fiscal years.  Admin. R. 6.

Further, the PRRB noted that the court in *Covenant I* "did not address the question of whether section 5504 of ACA and 42 C.F.R. § 413.78(g) could be applied retroactively."  *Id*.  Nevertheless, the PRRB concluded it was bound by the effective date of the law established by Congress, "which was July 1, 2010[,] as well as the Secretary's pronouncement in the Federal Register that stated that hospitals that shared training costs and nonhospital sites cannot count any of the resident time spent training at those nonhospital sites prior to July 1, 2010."  *Id*.

The ACA was enacted while Covenant's appeals (related to the 2002–2006 fiscal years) were pending.  Covenant believed that § 5504 of the ACA applied to the five years in question because its appeals were pending at the time of enactment, and so Covenant requested expedited judicial review from the PRRB.  The PRRB concluded that it was "bound by Section 5504 of the [ACA]," the applicable federal regulations, and the "Secretary statements regarding GME rulemaking in the November 24, 2010 Federal Register."  Admin. R. 6.  And because the PRRB determined that it was "without the authority to decide the legal questions of whether the statute

- 8 -

and regulations, are valid[,]" *id*., it granted the request for expedited review, which stands as a final agency decision, and within 60 days Covenant filed this lawsuit.

Now before the Court are two cross motions for summary judgment. Covenant asks that the Secretary's final decision disallowing benefits (the PRRB decision, dated May 7, 2012) be overturned. The Secretary requests just the opposite.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Medicare statute provides for judicial review of a final decision made by the PRRB. 42 U.S.C. § 1395oo(f)(1). Pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., an agency decision is set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 702; *see also Lester E. Cox Med. Ctrs. v. Sibelius*, 691 F. Supp. 2d 162, 166 (D.D.C. 2010). This arbitrary and capricious standard is a "narrow" standard of review: "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *reversed on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

## III

The parties take issue with two central points in their papers. First, the Secretary argues that Covenant's claims are barred by collateral estoppel because they were necessarily adjudicated during the previous litigation between the parties (*Covenant I*). Second, the Secretary argues that regardless of *Covenant I*, her reading of § 5504 of the ACA is permissible and that her decision to deny reimbursement should stand. Both issues are addressed below.

## A

The threshold question relates to whether Covenant is precluded from raising its claims because those issues were litigated in *Covenant I*. Although a close question, Covenant's claims are not foreclosed.

The Secretary argues that the Sixth Circuit's decision in *Covenant I* prohibits Covenant's attempt to relitigate "several of the issues and arguments" it previously presented. Def.'s Mot. 21. "Issue preclusion, often referred to as collateral estoppel, precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (citation omitted). Four requirements must be met before issue preclusion applies:

> (1) the precise issue must have been raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior proceedings must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Id*. (emphasis omitted).

*Covenant I* addressed the application of the written-agreement requirement—as it existed before 2004—to Covenant's 1999–2001 cost reports. Although the Secretary argues otherwise,

- 10 -

the case did not turn on the application of § 5504(c).  The Sixth Circuit's opinion in *Covenant I* does not even mention that section of the Act.  Accordingly, the PRRB concluded that the court in *Covenant I* "did not address the question of whether section 5504 of ACA . . . could be applied retroactively."  Admin. R. 6.  Thus, retroactive application of § 5504(c) was not "necessary" for the court's decision in *Covenant I*.  The court's conclusion—that Covenant was not entitled to reimbursement because it had not satisfied the written-agreement requirement—is independent of the question of whether § 5504(c) can be applied retroactively to payment periods beginning before July 2010.  That Covenant failed to satisfy the written-agreement requirement is also a permissible conclusion if § 5504(c) cannot be applied retroactively.  In short, the question of whether § 5504(c) applies retroactively was not necessarily addressed in *Covenant I*, and thus Covenant is not precluded from raising the claim here.

The question of whether Covenant is collaterally estopped by the court's earlier determination of the written agreement requirement itself is a more difficult question.  The Secretary argues that Covenant litigated whether it had satisfied the written agreement requirement in *Covenant I* and therefore cannot do so again here.  In *Covenant I*, the Sixth Circuit concluded that the written agreement requirement "legitimately applied to Covenant" from 1999 through 2001, and that Covenant "did not meet" that requirement during those years.  *Covenant*, 424 F. App'x at 439.  Importantly, although the current litigation concerns different cost periods, the parties have stipulated that all of the underlying facts relevant to the legal question are identical.  *See* Admin. R. 6.  Thus, the PRRB concluded that, as in *Covenant I*, "there is no written agreement between [Covenant] and Synergy" for the years 2002–2006.  *Id*. Because there is no written agreement, the Secretary argues that she is entitled to summary judgment.

Collateral estoppel would apply here were Covenant attempting to argue that it did have a written agreement with Synergy from 2002 through 2006. *Covenant I*, along with the parties' stipulation, however, forecloses such a line of argument. It should be emphasized that 42 U.S.C. § 413.78(g)(3), which is applicable to cost periods beginning on or after July 1, 2010, requires that a hospital have "a written agreement" *or* "incur the costs of the salaries and fringe benefits of the resident during the time the resident spends in the nonprovider setting[.]" *Id.* §§ 413.78(g)(3)(i), (ii). This marks a distinct departure from the regulations applicable to previous cost periods, under which a hospital had to "pay for all or substantially all of the costs" for the training program if there was not "a written agreement" or "an emergency Medicare GME affiliation agreement" in place. *See id.* §§ 413.78(e)(3), (f)(3). Accordingly, if the newly-enacted section—§ 413.78(g)(3)—applies retroactively, Covenant can satisfy the regulation's requirements without a written agreement or by incurring substantially all of the costs associated with the resident training program. So the conclusion in *Covenant I*, that Covenant did not have a written agreement with Synergy, does not foreclose Covenant's claims for reimbursement if § 413.78(g)(3) applies retroactively to Covenant's claims. If it does not apply, however, Covenant's claims are without merit, as there was no written agreement in place between Covenant and Synergy, and because Covenant did not incur all, or substantially all, of the cost of resident training programs from 2002 through 2006.

Accordingly, collateral estoppel does not preclude Covenant's claims in this lawsuit, as recognized by the PRRB. *See* Admin. R. 6 (explaining that the court in *Covenant I* "did not address the question of whether section 5504 of ACA and 42 C.F.R. § 413.78(g) could be applied retroactively.").

**B**

Although Covenant's claims are not foreclosed by collateral estoppel, they remain without merit. The Secretary's interpretation—establishing that § 5504(c) does not apply to cost periods beginning before July 2010—is a reasonable interpretation that will not be overturned. And as Covenant acknowledges in its motion, if the ACA does not "require the reopening of a hospital cost report" for which there was an appeal pending when the ACA was enacted, it cannot "pursue certain statutorily mandated Medicare payments to support its expenses for educating new physicians." Pl.'s Mot. 1. In other words, because the Secretary's interpretation is permissible, Covenant's claims are precluded.

When a court reviews an agency's construction of the statute which it administers, such as the ACA here, it necessarily confronts two questions. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc., v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).

If, on the other hand, the intent of Congress is not clear, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. Notably, the court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id*. at 843, n.11 (collecting cases). As the Supreme Court emphasized, the judiciary has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory

scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Id*. at 844.

**1**

The first issue, then, is whether Congress intended that *every* cost report be reopened for which there was a jurisdictionally proper appeal at the time of the ACA's enactment. Covenant argues this is the exact situation faced here: "Congress expressed its unambiguous intent in § 5504(c) that the Secretary must reopen any cost report for which there is a 'jurisdictionally proper appeal pending.'" Pl.'s Mot. 5, ECF No. 35.

But this is a distorted reading of the statute. Rather than mandating that every cost report for which there was an appeal pending must be reopened, Congress established that under no circumstances would a final cost report be reopened unless there was a pending appeal. As the Secretary points out in her motion, Covenant's argument "commit[s] the fallacy known as 'negating' or 'denying' 'the antecedent.' " Def.'s Mot. 30. Explained by the D.C. Circuit Court in *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 370 (D.C. Cir. 2013), the logical syllogism of A implies B is simply not the equivalent of non-A implies non-B. So while § 5504(c) establishes that if there was not a pending appeal concerning a final cost report when the ACA was enacted, that cost report will not be reopened, § 5504(c) does not establish that if there *was* a pending appeal concerning a final cost report when the ACA was enacted, that cost report *must be* reopened; on this point the statute is silent. Covenant's argument is undermined by the exact misunderstanding warned against in *New England Power*.

Moreover, "[w]hen a case implicates a federal statute enacted after the events in suit," as the case here, "the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to

- 14 -

judicial default rules." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).  Through §
5504(c), codified in 42 U.S.C. § 1395ww(h), Congress expressly prescribed the statute's reach.
"[E]ffective for cost reporting periods beginning before July 1, 2010," residents' time in
nonhospital settings counts toward a hospital's FTE score only "if the hospital incurs all, or
substantially all, of the costs for the training program in that setting." *Id*. § 1395ww(h)(4)(E)(i).
"[E]ffective for cost reporting periods beginning on or after July 1, 2010," residents' time in
nonhospital settings counts toward a hospital's FTE score if the hospital simply "incurs the costs
of the stipends and fringe benefits of the resident during the time the resident spends in that
setting." *Id*. § 1395ww(h)(4)(E)(ii).

So although Congress established in § 5504(c) that the amendments will not be applied
"in a manner that requires reopening of any settled hospital cost reports as to which there is not a
jurisdictionally proper appeal," Congress expressly indicated in the statute itself what standards
apply to what cost periods.  There is no need for this Court to consider whether Congress
intended the standard that allows for cost sharing between hospitals (§ 1395ww(h)(4)(E)(ii)), to
apply retroactively, or that Congress intended different standards for different hospitals
depending solely on the existence of an outstanding appeal.  Congress expressly indicated that
the new standard only applies to "cost reporting periods beginning on or after July 1, 2010[.]"
*Id*.  Absent "clear congressional intent favoring" the application of this section retroactively—
indeed, when confronted with evidence that Congress's intent was just the opposite—the Court
will not conclude Congress intended the new standard for FTE determinations to apply to cost
periods before July 2010.

**2**

Thus, the second step outlined in *Chevron* for statutory interpretation applies here, and the precise issue becomes whether the Secretary's interpretation of § 5504(c) "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The Court concludes that it is.

Covenant attacks the Secretary's interpretation of the statute in three ways. First, it argues that the Secretary's position "is infirm because it does not square with the words of the statute." Pl.'s Mot. 10. Specifically, Covenant argues that "subsection (c) would be superfluous if § 5504 were prospective only, as there would be no occasion to reopen any past cost reports, pending or otherwise." *Id.* "Only if subsection (c) is read to require reopening in limited circumstances can full force and effect be given to every provision of the statute." *Id.* at 11.

It is nothing new that courts must "give effect, if possible, to every clause and word of a statute." *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (citation omitted). The Secretary's proposed reading of § 5504 would do just that. Under the Secretary's reading, time spent by residents in nonhospital settings for cost periods commencing before July 1, 2010, would count toward a hospital's FTE score only if the hospital incurred all, or substantially all, of the costs for the training program. Time spent by residents in nonhospital settings for cost periods commencing on or after July 1, 2010, would count if the hospital incurred the costs of stipends and fringe benefits for that resident. And, neither section will apply in a way that would require the opening of closed cost reports for which there was not a pending appeal when the ACA was enacted. The Secretary has not left out a single word. Contrary to Covenant's argument, interpreting § 5504(c) in this way does not leave the subsection with "no work" to do,

Pl.'s Resp. 6, ECF No. 35, as it would still prevent, under all circumstances, the opening of closed cost reports for which there was no pending appeal.

More importantly, the interpretation Covenant advances would nullify an entire provision of the statute. Covenant wants the standard established by § 5504(b), codified as 42 U.S.C. § 1395ww(h)(4)(E)(ii), to apply to cost periods from 2002–2006, even though the statute itself provides another standard for those periods (established by § 5504(a), codified as 42 U.S.C. § 1395ww(h)(4)(E)(i)). Thus, Covenant's reading would make meaningless the standard set forth by § 5504(a), and such an interpretation does not stand up to scrutiny.

With its second argument, Covenant contends that the Secretary's position conflicts with a position she has taken with regard to an analogous provision of the ACA. Section 5505(d) is substantively identical to § 5504(c), providing in relevant part, "The amendments made by this section shall not be applied in a manner that requires reopening of any settled cost reports as to which there is not a jurisdictionally proper appeal pending as of the date of the enactment of this Act . . . ." ACA, Pub. L. 111-148, § 10501(j), 124 Stat. 119, 999 (2010) (§ 10501(j)). Covenant then cites *Henry Ford Health Sys. V. Dept. of Health and Human Servs.*, 654 F.3d 660, 667 (6th Cir. 2011), where the court held that the provisions established by ACA § 5505 do apply retroactively. Covenant urges the same conclusion for § 5504(c).

But there are significant differences between this case and *Henry Ford*, as well as between the statutory provisions involved. Indeed, *Henry Ford* concerned "[i]ndirect costs" under the Medicare program, *id*. at 663, while this case addresses direct costs "such as residents' salaries," *id.* (citation omitted). More importantly, the court in *Henry Ford* held § 5505 had retroactive effect not merely because of the language included in § 5504(c) that Covenant relies on. Instead, the court in *Henry Ford* emphasized different language:

- 17 -

> The starting assumption is that Congress intends statutes to operate prospectively, and when Congress delegates rulemaking authority to an agency, we presume that delegation allows the agency to regulate prospectively. Only express congressional authorization for the agency to regulate retroactively will defeat this presumption.
>
> Congress gave just such authorization here, saying that the Secretary may promulgate regulations with retroactive effect. The relevant part of § 5505(b) authorizes the Secretary to "define[ ]" eligible "non-patient care activities" for 1983 to 2001. Congress confirmed the point in two other places. It instructed the Secretary to "implement the amendments made by this section in a manner so as to apply to cost reporting periods beginning on or after January 1, 1983." And it said that the new statute applies only to open cost reports and to those cost reports "as to which there is . . . a jurisdictionally proper appeal pending as of the date of the enactment of this Act."

654 F.3d at 667 (internal citations omitted). Thus, it was not the language Covenant relies upon that granted the Secretary authority to apply the statute retroactively. It was the "relevant part of § 5505(b)" that authorized the Secretary to act retroactively, and the language Covenant relies upon only helped to "confirm[] the point." *Id*. There is no similar language in § 5504 that allows for the Secretary to define terms retroactively, as § 5505(b) allows. *See Henry Ford*, 654 F.3d at 667. Instead, the like provisions from § 5504 (codified as § 1395ww(h)(4)(E)), establish precisely what standards the Secretary is to use for cost periods commencing before July 1, 2010, and what standard applies to periods commencing after that date.

The fact that the same language is used differently in the two provisions is significant. Although there is a "presumption that identical words in different parts of the same Act are intended to have the same meaning," *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 582 (2004) (citation omitted), this presumption "is not rigid and readily yields where . . . there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the Act with different intent," *id*. Here, § 5504(c) and § 5505(d) apply to different provision with different language, and there is nothing

unreasonable about the Secretary's treating the same language as having different meanings in the two contexts.

Finally, Covenant argues that the Secretary's position conflicts with her own regulations. It cites to language from 42 C.F.R. § 413.78(g)(6), almost identical to § 5504(c), which establishes that the "provisions of paragraphs (g)(1)(ii), (g)(2), (g)(3), and (g)(5) of this section cannot be applied in a manner that would require the reopening of settled cost reports, except those cost reports on which there is a jurisdictionally proper appeal pending on direct GME or IME payments as of March 23, 2010." But Covenant's argument is entirely circular. The same language appears in both the applicable statutory provisions and the resulting regulations. The Secretary interpreted both as being only prospective. It does not help Covenant's position to argue that the Secretary misinterpreted the statutory language simply because she had the same interpretation of the language in the regulations.

Moreover, while an agency is accorded "broad discretion in administering the law and interpreting its enabling statute," that agency is entitled "to even greater deference when it acts pursuant to an interpretation of regulations promulgated by the agency itself." *Culbertson v. U.S. Dept. of Agriculture*, 69 F.3d 465, 467 (10th Cir. 1995). This only underscores the point; the Secretary's interpretation of § 5504(c) is not undermined by her identical conclusion regarding § 413.78(g)(6).

Whether Congress intended cost reports for which there was a pending appeal when the ACA was enacted to be automatically reopened is unclear. In fact, in several places in the ACA, Congress expressly indicated that it did intend retroactive application of the new statutory scheme. *See*, e.g., ACA, Pub. L. 111-148, § 1556(c), 124 Stat. 119, 260 (2010) ("The amendments made by this section shall apply with respect to claims filed under part B or C of the

Black Lung Benefits Act . . . after January 1, 2005, *that are pending on or after the date of enactment of this Act*.") (emphasis added).  That Congress expressly applied certain statutory provisions retrospectively in other places makes suspect the fact that it did not do so in § 5504(c).

And, where the intent of Congress is not clear, the Court must determine whether the Secretary's "interpretation is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 866.  Notably, the Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."  *Id*. at 844.  The Secretary's interpretation of § 5504(c) is based on a permissible construction of the statute—that reopening closed cost reports is not mandatory simply because there was a pending appeal when the ACA was enacted.  Nothing in the Act compels the opposite conclusion, and thus the Secretary's interpretation will stand.

## IV

Accordingly, it is **ORDERED** that Covenant's motion for summary judgment, ECF No. 23, is **DENIED**.

It is further **ORDERED** that the Secretary's motion for summary judgment, ECF No. 27, is **GRANTED**.

Dated: January 30, 2014                              s/Thomas L. Ludington
                                                     THOMAS L. LUDINGTON
                                                     United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was
served upon each attorney or party of record herein by
electronic means or first class U.S. mail on January 30, 2014.
                        s/Tracy A. Jacobs
                        TRACY A. JACOBS

- 20 -